And at this time, we'll hear United States v. Martinez, Fiorentina, Tejada, and Rodriguez. Good morning. Good morning, Your Honor. Mary Beth Covert from the Federal Public Defender's Office here on behalf of Randall Martinez. Mr. Martinez's case asks this Court what the minimal level of inquiry is acceptable when a defendant requests new counsel or complains about his counsel. A chronological breakdown of this case, if we take it in segments, shows that there was virtually no inquiry, and the inquiry that was done when Mr. Martinez complained about his counsel was wholly insufficient. Following indictment and before he actually took his plea in November of 2011, he filed an initial letter complaining about his counsel. He said, my lawyer's not helping me adequately. There were several court appearances, three court appearances, before he files his next letter complaining about his counsel. I think you have a fair argument that that should not have been ignored. On the other hand, at the taking of the plea, he was asked if he had an opportunity to discuss it with Ms. Seltzer and was satisfied to have her represent him, and he said yes. He actually, Your Honor, yes. He does the rote affirmations that all judges do on pleas. Have you had an opportunity to talk to your lawyer? You may call it a rote affirmation, but, I mean, we rely on these things, and they serve this purpose. Certainly, Your Honor. But in the context of a defendant who has complained about his lawyer with no recognition on the record that the court has received those complaints, heard those complaints, and there's nothing in the plea colloquy contrary to the government's characterization that the court specifically addressed his letters, there's nothing in the plea colloquy that addresses the letters that he's complained about his counsel. And the complaints were specific. She hasn't filed motions on my behalf. She hasn't sent me documents in my native tongue. He doesn't speak English. He complained that my lawyer wasn't communicating with me in Spanish, that she was sending everything to him in English. You can compare that to the plea he took in his Manhattan case. In the Manhattan case, the judge there said, have you been provided everything in Spanish? Have your documents been read to you in Spanish? And he said yes. That didn't happen here, even. So the complaints that he had. The judge did hold a hearing and gave Mr. Martinez a chance to explain why he wanted new counsel, and he declined. Well, a careful examination of that hearing, though, indicates that when they came to the hearing, she asked his lawyer to indicate what they were there for, and she said, I had reviewed the plea transcript. He complained about his plea. She then turns to him and says, do you have anything else to add? Doesn't say, I've received three additional letters, a total of five now from you complaining about your lawyer. Do you have anything additional you would like to add? That is not what the government characterizes as declining the court's opportunity to be more specific. How would he know? It is an opportunity. But how would a defendant know that what they've submitted, the five letters that they've submitted complaining about their counsel, isn't sufficient? How are they to know that that's not what the court needs to hear or isn't going to address it? The fact that he says nothing doesn't mean that he hasn't, in those five letters, articulated very clearly what his complaints were. She hasn't objected to the pre-sentence. I have errors in my pre-sentence investigation report. And there are no objections that are filed to the pre-sentence investigation report. Let's fast forward to sentencing. He continues, after his plea, to write letters and complain. He continues to say, at the plea, what was important to Mr. Martinez was, I never possessed a firearm. They've charged me with brandishing, but I've never possessed a firearm. The pre-sentence investigation report comes out, and very specifically in the pre-sentence investigation report on page 37, there is one of the robberies, and it says, Mr. Martinez brandished a firearm. Randall Martinez brandished a firearm. He had been very clear in his plea. That was the one thing that he was emphatic on in his plea proceeding, was that he had never had a firearm. When the government at the plea said, we have evidence that he brandished, he said, not me, no way, I didn't have a firearm. The defense lawyer doesn't object to that in the pre-sentence investigation report. And in fact, when the government at sentencing advocates for a higher sentence than what the defense counsel is advocating for, they say, we have evidence he possessed two firearms, and his counsel says, yes, that's correct. So are you making a case for ineffective assistance now? We're making the case in the context of that there wasn't an adequate inquiry into what his complaints were about his lawyer. And one of the prongs of that is that whether or not the conflict was so great that it resulted in a lack of communication preventing an adequate defense. And the lack of communication preventing an adequate defense is, in part, him taking a plea. Everyone's surprised when he comes to the plea proceeding, and suddenly that day he says, I'm going to take a plea today. And nobody's prepared, and nobody even has the indictment with them. And then, when you look from the time of the plea until the time of sentencing, there's no objection to the pre-sentence investigation report, that notion that he possessed firearms and he had firearms. There's no objection filed. She affirmatively says, yes, he did. And then the judge uses that as a basis for imposition on the sentence. Said, I also find you weren't just a lookout, you possessed firearms. On the firearm charge, our review is plain error, am I correct? Correct, Your Honor. Correct, Your Honor. On the firearm, did he allocute sufficiently with respect to the 924C charge? And the plain error- Was the allocation sufficient with respect to aiding and abetting that charge? Well, I think when you look closely at what the judge informed him about what was required, it's really quite confusing, I think. When you read the transcripts on page 14 and 15 of our brief, but when you look at what the judge said, there's aiding and abetting, and accurately identifies what aiding and abetting is, and then says, so if you're guilty, if somebody is guilty of the conduct that occurs in count three, guilty of the conduct that occurs in count three, not you can be found guilty of aiding and abetting if somebody else possesses the firearm, brandishes it, and then you helped assist in committing the offense. You wished to accomplish something that you wished to bring about. Correct, Your Honor. And I'm just saying, I think that given the context of it not being explained to him in furtherance of a crime, in furtherance of a drug trafficking or a crime of violence, that it's not explained to him in a way that I think is at all clear. I see my time has expired. You've reserved rebuttal. Thank you. We'll hear you then. Good morning. Jim Brandon. I'm here for Henry Fiorentino. I just wanted to highlight certain aspects of the issues that I raised in my brief. With regard to the sufficiency point, Mr. Fiorentino was indicted in November of 2009. If he withdrew from the conspiracy by November of 2004, he has a complete defense to the charges based on the statute of limitations. At the trial, there were five cooperating witnesses. All of them testified to committing robberies with Mr. Fiorentino. None after 2003. That's not how you withdraw from a conspiracy. That's correct. But I think it's in my favor that there was no robbery after 2004. He has a point. Okay. But in addition, starting in 2004, the gang, if you will, developed a new modus operandi for these robberies. Before 2004, they used the fake cop ruse. They would pretend to arrest drug dealers and steal their drugs from them. But after 2004, one of the Fernandez brothers, I think it was Eudris, developed a plan whereby they would put GPS locating devices inside cars that had traps, and then the garage man would notify them of potential drug smugglers and traffickers. In this way, it was even more safe than the way that Mr. Fiorentino had wanted to commit these robberies. But it made his participation obsolete for the group. And thirdly . . . Why did he become obsolete? Because they weren't committing the fake cop robberies anymore. His specialty? That was his specialty. Correct. Was he the defendant who obtained the drug sniffing dog? Yes, he was. Yes. And thirdly, he communicated his withdrawal to all of these cooperators in some manner. It was not as clean as I am withdrawing from this ongoing conspiracy at this time. But with regard to Beato and Fernandez . . . I'm not sure if I'm pronouncing Mr. Beato's name properly. The last robbery was the Fort Independence robbery, and at that robbery there was some violence. And Mr. Fiorentino was greatly upset by that. He ripped off all of his police garb and told all the others, I'm never working with you all again. Then with regard to Cano Martinez, he actually ordered Mr. Cano Martinez to return . . . After he said that, did he do anything in furtherance of the conspiracy? Not with anybody, but certainly not with Hernandez and Beato, who were present for that robbery. Not with anybody is the way it would have to be. Correct. So with regard to Cano Martinez, he actually demanded of him all of the police garb that Mr. Cano Martinez already had, and then said, I'm not working with you either. Okay. And the third group of cooperators were the Fernandez brothers, with whom he had his greatest problems. They fought over a car. There was . . . Mr. Fiorentino was shorted on what I call the Long Island job, which was in the middle of 2003. And then one of the Fernandez brothers, Domingo, was kidnapped shortly after Mr. Fiorentino was shorted. They all believed he was the kidnapper. And Domingo testified at the trial, he didn't need a letter from Mr. Fiorentino saying he was out. Everybody understood they were no longer working together. And finally, there was evidence submitted at the trial that Mr. Fiorentino had extensive travel in Florida and the Caribbean, beginning in 2004, and that he was incarcerated for a certain period of time following 2004. All of this making further impossible his continuation in the conspiracy. With regard to the sentencing, which is the second point in my brief, I note quickly that Mr. Fiorentino was sentenced to 264 months imprisonment. Of the 23 co-defendants in this case, there's only two who got more, and one of those was convicted of a 924C count. The judge did seem to be impressed with his baseball bat beating of somebody just because that person's the brother of somebody. He did, but on the whole, what Mr. Fiorentino was trying to do with the fake police officer ruse was to not have violence. There is that incidence of violence, but I also draw your attention to the fact that Mr. Fiorentino had nine robberies to his name. Some of these defendants had 100, 150. I mean, he was like a lesser player compared to everybody else, so it's quite extreme for him to be at the very high end of the imprisonment term. Thank you. Thank you. Yes. May it please the Court. My name is Robert Caliendo, and I represent Jose Tejada. Your Honors, I'd like to please start with the obstruction point, and the reason that those two convictions must fall is because the conduct attributed to Tejada had an insufficient nexus to the grand jury, which was supposedly the proceeding sought to be obstructed. If we consider the leading cases that talk about this nexus requirement, there's three cases that were upheld and three cases that were overturned. Aguilar, Schwarz, and Arthur Anderson were overturned. Quattrone, Reich, and D'Esposito were upheld. In Aguilar, the defendant made a false statement to an agent who may or may not have later testified before a grand jury. The agent specifically told them the grand jury might hear evidence. Same thing in Schwarz. In Arthur Anderson, which was overturned because of jury instructions, but the facts were that the defendant instructed his employees to destroy documents potentially to be used later in an official proceeding. Three cases that were upheld, Quattrone sent an email endorsing document destruction when he personally knew there was an outstanding grand jury subpoena that requested them. Reich faxed a forged order to his lawyer that directly altered the course of ongoing litigation in the Second Circuit in the Eastern District. And D'Esposito wrote a series of letters instructing others to create specific fake pieces of evidence while he was sitting in jail on that particular case. Which case is Tejada's more like? It is plainly more like this first category of cases that all came back rather than these cases that was upheld. And that's because his conduct had no nexus whatsoever to the grand jury. In the normal course of things, you go to the grand jury, you get a true bill, an indictment, then you get an arrest warrant. And then there's the court proceeding that follows. If someone's asking about the arrest warrant, they have no interest in the grand jury. From their perspective, the grand jury doesn't mean anything. It's over. They're interested theoretically in that arrest warrant itself or the proceeding that would follow in the district court. And to adopt the government's position broadens the statute or broadens the conviction here in such a way that any conduct that's ever going to touch on this criminal case, even later on an appeal, even later in a habeas context, could conceivably be reaching back to the grand jury. And that's too far afield. The Judge Gleeson said running someone's name through a warrants database supports an inference that the defendant was trying to find out if there was a warrant. It doesn't follow from the existence of a warrant that there was a grand jury proceeding at all, or that Tejada had some interest in the underlying proceeding from which a warrant might emanate. That hits the nail on the head. Curiosity about a warrant does not get you where the government wants to be. There's the nexus that needs to exist, but there's also the defendant's intent. Tejada must have intended to affect this grand jury proceeding. But there is no evidence. The witnesses testified, oh, if I knew there was a warrant, I wouldn't have come back. But there is no evidence that that was communicated to Tejada or that he knew about it. What do you suppose he thought was the basis for their curiosity? The person who told him to check was Tinio, and Tinio, throughout the entire trial, made it clear that he was the kind of person that gave you only enough information for you to do what he wanted you to do without telling you everything. And Tinio did give him a raft of other reasons why he should be checking to see if people's licenses were clean, to see if they could get back into the country because one guy had a problem at JFK when he came in previously. So there was not sufficient evidence that Tejada knew why these people wanted it run and that it was his intent. There was also the government's argument that, oh, well, someone important in the conspiracy got arrested a couple days before, and now they want to see if this person's arrest has prompted something. But there was no evidence that Tejada knew about that arrest. So not only has the nexus requirement failed, but there is no intent either. Foreseeability, another hurdle that the government can't meet. Tejada must have foreseen a specific grand jury proceeding. In order, the government argues that because he was a cop and he had testified in the grand jury a couple times after arrests have made, that he would have somehow known that there was a grand jury proceeding. Putting aside that he didn't even know the arrest had been made. The moment remaining, do you want to talk about the identification? Yes, Your Honor. The Georgianos. The 801 says that if the government wants to expand 801 to allow an officer or an agent to testify about the identification, then it should at least be a reliable identification. And here the identification was dangerously unreliable. At trials, she said the only description she gave was that she knew he was tall and Dominican looking. That was for one person, supposedly Tinio. The other one, bad skin and a mustache. That's supposedly Tejada. What the cop did was he mixed together her supposed description, the husband's supposed description, and the description of a daughter who didn't even testify, put it all together to make one composite description, and then told the jury, well, they basically all said the same thing, leaving the jury with the impression that three different people came up with this. So you argue it was error to allow this identification testimony by the police officer? By the agent because it violates 801. And the strongest case the government cites to combat that is the Lewis case. And even in Lewis, it says Lewis was about the lack of an in-court ID. Lewis says failure or refusal of the identifying witness to recall in court the earlier identification might well raise questions concerning the adequacy of cross-examination and right to confrontation of the original identifying witness. But why wasn't it harmless error? This was very much an ID case, Judge. There was a laundry list of cooperators, and this was a quintessential example of quantity over quality. The only person who could really identify Tejada was Tinio because they knew each other. So when you have a civilian presented to the jury as three civilians, making it look like Tejada was the person who actually did this robbery, it was incredibly damaging and impossible for him to come back from. Thanks. Thank you, Judge. Thank you. Good afternoon, Your Honors. My name is Ephraim Savitt. I was appointed by the court to represent Marcos Rodriguez in the post-trial proceedings. I was not his trial counsel. And this appeal really concerns one issue, and that is the issue of whether or not Judge Towns properly added a seven-year term based on a 924C conviction, which was the subject of Rule 33 proceedings. And it also involves disparate treatment based on the same record, essentially the same record by two different judges in the Eastern District, one of whom, now former Judge Gleason, sued Esponte, as I understand it, at the end of the government's case in the Fiorentino trial, which was a separate trial altogether, dismissed the gun charge there because there was no evidence of any gun possession or use within the limitations period. And Judge Gleason predicated his decision in Fiorentino based on a combination of the United States Supreme Court's which stands for the proposition that for accessorial liability, the government must show actual knowledge in advance by the aider and abetter that one of his cohorts will be using a gun in connection with a crime of violence or a narcotics crime, and that the defendant, who is the accessory to the crime, acquiesced in that particular predicate crime. In this case, Marcos Rodriguez was charged with having participated in one form or another in connection with 15 robberies, Hobbs Act robberies, all of which predated the limitations period. And in the course of those 15 robberies, Marcos Rodriguez, in the main part, in fact, in almost all the robberies, his participation was that of a lookout, according to the government witnesses. In other robberies, he did some surveillance, and he also sold some of the narcotics that were taken in the course of the drug-related robberies. But in none of these 15 robberies with which Mr. Rodriguez was implicated at trial, did he use or possess a gun. He was an accessory. So this defense was not raised before trial, correct? That's correct, Your Honor. This defense was not. So we're looking at plain error. Conceitedly, we're looking at plain error, yes, Your Honor. If we find it. If you do find it. And I believe that the error here is plain because there was error. It was plain error. It affected substantial rights. It does. That's a seven-year additional term for Mr. Rodriguez. And it calls into question the evidence. You raised ineffectiveness in the district court. In a sense, Your Honor, I did. Yes, Your Honor, I did raise that. In a sense? In what sense? In the sense that you did? In a sense that I was reluctant to raise ineffectiveness based on the record of the case because counsel did, in fact, get up and cross-examine witnesses, and he did, in fact, address the jury both in opening and closing statements. The ineffective part that I . . . It does seem odd. He pursued an innocence defense, but that wouldn't have stopped him from raising statute of limitations at the outset. Conceitedly, Your Honor. And that's the reason we're not raising any challenge to Judge Towns's rejection of Rule 33 in connection with multiple conspiracies slash statute of limitations as to the robberies themselves. But if the Rule 33 was rejected because it was so late, then you'd think that would raise some question as to the effectiveness of counsel. I mean, that's the kind of thing that it's like right in front of your nose. No, I understand that, Your Honor. I understand, and I was trying to be absolutely faithful to the record and not to raise any frivolous claims. I appreciate it, but . . . What it has to do with is a reading of the cases that would require that any accessorial responsibility for a gun possession or use should be within the statute of limitations. Here, none of the robberies that Mr. Rodriguez participated in, according to the record, were within the statute of limitations. So this brings us within the ambit, it seems to me, of the Pratty case, where although in that case a gun was seized before the statute of limitations period started, in this case, if there's a complete absence of any use, any brandishment of any weapons, because there were no weapons-related robberies that took place within the statute of limitations, how could Mr. Rodriguez then be responsible under Pratty and also under Rosemont as an accessory to the crime for gun possession, which didn't even occur within the statute of limitations, within the framework of the record? So my argument is based on a reading of the case law that Judge . . . who's much smarter than I am, decided, based on those opinions, rather than whether or not counsel was competent. That's the gravamen of this appeal. And it seems to me, Your Honors, that if you can't show that anybody used a gun within the statute of limitations period, how can you impute the use or brandishment of a gun on an accessorial basis to Marcos Rodriguez? Thank you. Thank you, Your Honor. Please, the Court. Alex Solomon for the government. And with the Court's indulgence, I'll be addressing the arguments of counsel for Mr. Fiorentino and Mr. Tejada. Can you lift the microphone a little bit? I apologize. Is that better? And my colleague, Ms. Schwader, will be addressing the arguments as to Randall Martinez and Marcos Rodriguez. Turning first to the defendant Fiorentino, Mr. Fiorentino was charged within the statute of limitations period  There was no evidence . . . The issue is withdrawal. Correct, Your Honor. And we submit that there was no evidence at trial of Fiorentino's withdrawal from the conspiracy. At best, there is evidence of some dissension, which culminated in late 2003 in an incident in which Mr. Fiorentino, together with defendants and co-conspirators Beato, Hernandez, and Villamon, participated in the brutal baseball bat beating of Rudy Crespo. After that incident, Mr. Fiorentino fled to the Dominican Republic, fearful that he was going to be apprehended by law enforcement. He didn't flee there alone. He fled there with a co-conspirator. That was Abelardo Villamon, who had participated in robberies together with Mr. Fiorentino and the rest of the crew. In the Dominican Republic, Mr. Villamon and Mr. Fiorentino participated in a gunpoint incident in which they obtained the proceeds that had been stolen from a robbery that occurred in New York. And while Mr. Fiorentino was down in the Dominican Republic, he was in touch with co-conspirators, including Mr. Hernandez, who warned him that law enforcement was looking for him with respect to the baseball bat beating. He was also later in touch with Gabriel Cano Martinez and discussed the possibilities of doing robberies in other jurisdictions, together with Gabriel Cano Martinez. In fact, when Mr. Fiorentino later returned to the United States, he had co-conspiratorial discussions with other members of the conspiracy, including Domingo Fernandez. He discussed with Domingo Fernandez the possibility of doing additional robberies. So quite simply put, there was no evidence that he withdrew. In fact, the evidence showed that he continued to do robberies in New York together with a co-defendant in the same case. That co-defendant is Marcos Rodriguez. In his proper statements, which were admitted at trial, Mr. Fiorentino admitted that he and Marcos Rodriguez continued to do drug robberies. Turning to the reasonableness of Mr. Fiorentino's sentence, I submit that Judge Gleeson carefully weighed all of the 3553 factors, including the fact that Mr. Fiorentino had attempted to cooperate with authorities in the Southern District of New York and came to what was a sufficient but not greater than necessary sentence of 264 months. This sentence was in the high range of the sentences for all co-defendants in the case, but despite what Mr. Brandon says, Mr. Fiorentino was not some sort of angel who only participated in innocuous drug robberies. These were events with a serious possibility for violence where you had individuals posing as law enforcement. Sometimes in these incidents, people were armed. And when you're stealing hundreds of kilograms of cocaine, there's a grave possibility that violence will erupt, as evidenced by the Rudy Crespo beating. So we believe that the 264-month sentence was entirely reasonable. Turning to Jose Tejada, if there are no further questions as to Mr. Fiorentino, I'll first address the arguments as to his convictions under Section 1512. I believe that Judge Gleeson had it exactly right at sentencing in denying the Rule 29 and Rule 33 motion as to those counts of conviction. Judge Gleeson noted that in an ongoing grand jury investigation, if Tejada were successful in keeping away co-defendants out of the United States, he would have effectively frustrated— You're assuming an ongoing grand jury investigation? Correct. And there was, in fact, an ongoing grand jury investigation. To finish the thought, Your Honor, if Mr. Tejada had been successful and kept Teneo and Paulino out of the jurisdiction, the grand jury would not have returned an indictment charging him with robbery conspiracy. So he would have frustrated the goals of the grand jury. As Judge Gleeson noted, quite often in ongoing grand jury investigations, each time you have arrest of a defendant, there's a possibility the defendant will cooperate with law enforcement authorities, provide additional information that's then presented to the grand jury in its ongoing investigation that can lead to additional charges of others. That's what happened here, and that's why there is a nexus. Turning to the identification procedure, I think, first of all, there is abundant case law standing for the proposition that it is entirely appropriate for law enforcement witnesses to present testimony as to prior identifications made by eyewitnesses. Ordinarily after a second viewing, so they can testify to what goes on at a photo array or a lineup, but there was no second viewing here. I understand, Your Honor. In essence, there was a sort of second viewing. Both of the Giordanos testified that they could no longer make statements of identification that were as reliable as the statements they made the night of the home invasion. However, if we look— There's a circuit split on this issue, isn't there? Well, I think we should adopt the reasoning in Brink from the Third Circuit. And I'm not aware of—I'm not necessarily aware of contrary authority from other circuits standing for the proposition that an identification must be as to a photographic array or a standup, necessarily. After. It says after. After. Isn't that in 801, the word after? I'm sorry? Isn't after in the statute? So the statute reads that a statement is not hearsay where the statement identifies a person as someone the declarant perceived earlier. And in this case, the declarants, the eyewitnesses, perceived Jose Tejada and Yvonne Teneo earlier. And this is somewhat akin to the situation in Brink where the eyewitness perceived the bank robber as having brown eyes. This wasn't necessarily a photographic array or a show-up. I assume for the sake of my question that it was error to admit that testimony. His counsel just told me that this was a purely identification case. Tell me why it was harmless error. There was abundant evidence as to this defendant's participation in the Schley Avenue robbery. But this is where the identification comes from. That's correct, Your Honor. So first of all, there was Ivan Teneo who testified as to Jose Tejada's participation in this robbery and as to the other robberies. You also have the testimony of Sergeant Jones, who was the commanding officer the night of that incident, who testified that he assigned Jose Tejada to only one hospital run in his entire tour of duty. And on that occasion, when it was time for Jose Tejada to be sent to the hospital, he was nowhere to be found. And a review of NYPD records from the 28th Precinct showed that Jose Tejada, in fact, had only done one hospital run, and that was the night of the Schley Avenue robbery, and his accounts were entirely unaccounted for. And then you also have the fact that Jose Tejada repeatedly ran his own name through warrants-only databases looking for a warrant in his name. You're talking about the identification, the evidentiary ruling allowing the police officer to testify. Yes, I understand, Your Honor. And I think our argument would be that there was abundant-assuming that there was error in allowing that hearsay to come in, there was still abundant evidence showing that Jose Tejada had participated in both the conspiracy to rob drug dealers and the conspiracy to deal drugs. Isn't there an issue as to whether it's hearsay to begin with? You mean as to Detective Polizzi's testimony? Yeah, the testimony about what the Georgianos had described earlier. Is it your position that it is hearsay? It's our position that it's not hearsay because under 801 D1C, the rule provides that it's not hearsay if it's a statement of identification. Correct. And I think the last point I would raise to the Court is to the extent Mr. Caliendo is complaining about the inability to conduct an effective cross-examination of the Georgianos and of Detective Polizzi, I think the Supreme Court made clear in Owens that in these scenarios, we're admitting evidence of a prior statement of identification. There is no constitutional right to the most effective cross-examination possible. We satisfied our constitutional obligations by having both the Georgianos and Detective Polizzi available for cross-examination. If there are no further questions, I'll pass the baton to Mr. Schrader. Yes, thank you. May it please the Court. My name is Sylvia Schrader and I represent the United States in the appeals that were brought by Randall Martinez and Marcos Rodriguez. To respond to the points made by Martinez's lawyer, first, Marion Seltzer did file a motion for a bill of particulars, which was one of the specific complaints that Martinez raised. And the motion had been filed prior to Judge Towns even receiving the letter, so that point, for example, had become moot. In addition, Marion Seltzer did indicate in her letter that she had discussed, in her sentencing letter, that she had discussed the PSR with Martinez and any objections were noted below. That's at Martinez's appendix at 204. So whether there were still objections that he had to the PSR or not, she did discuss those issues with Martinez and raised those in her sentencing letter. And then as for the sentencing itself, well, of course, there's a different standard at sentencing as to whether or not Martinez had firearms versus when he made the plea. Whether he was consistently going to say that he did not possess a firearm or brandish a firearm, the government, if the government provided sufficient proof to the probation department, the probation department decided by a preponderance of evidence that the government had shown that he possessed firearms, that could be included in the PSR. So that's not necessarily an error. It's just a different standard at that time. And then the third point I'd like to raise in response to Mr. Martinez's argument is that at Martinez's appendix at 141, you can see that Judge Towns specifically says in explaining aiding and abetting liability for the gun, so it is not necessary for the government to show that you yourself physically committed the crime in count three in order for the government to meet its burden of proof. It was clear in all the words that Judge Towns could have used what aiding and abetting meant and that the defendant didn't himself have to carry the gun. And, in fact, he admitted that at the appendix 164, he admitted that there was more than reasonable foreseeability because he said that he knew that his co-conspirators brandished guns, specifically said on some occasions they would pull their firearms out to scare people. So if he wants to complain now because he doesn't like the fact that he ended up getting a seven-year sentence, that's not what the law accounts for. If there are no other questions on the Martinez, then I'll turn to Rodriguez. Go right ahead. Okay. And then as for Rodriguez, unfortunately for Rodriguez, Musacchio v. United States is a case that the Supreme Court decided this year in which it specifically said that a district court's failure to enforce an unraised limitations defense under Section 3282A, the statute of limitations, cannot be a plain error. So he's out of luck. If it wasn't raised before or during trial, yes, it would be considered as plain error, but Musacchio— What are the circumstances in which you'll want to see what the entire—what's going on in the trial and what comes in and what doesn't and decide then that that could affect whether you actually have a useful statute of limitations defense? Sure. And, I mean, that may have been why it wasn't raised during trial. But the judge needs to be aware so that the government can put on its opposition or rebuttal to that defense and that the judge can put into the jury charge a statute— Well, there was a Rule 33 motion. The government presumably responded to it. The government did respond to it. And, I mean, in fact, here, of course, we know that there wasn't a legitimate statute of limitations defense. And Mr. Savitt wants to have it both ways and say, well, you can't have an inconsistent ruling on the gun charge. But he specifically said at government exhibit page 273 during the post-trial motion argument, he was talking about how it was okay to have inconsistent verdicts with the fact that Judge Towns had raised, well, there was a withdrawal of the conspiracy, a statute of limitations defense in Fiorentino, and it didn't work. And Mr. Savitt said it's okay to have inconsistent verdicts. But you can't have it both ways because now he's saying it's not okay that there's an inconsistent decision with the gun count that Judge Gleeson decided to throw out, which, of course, we disagree with. But there were different facts with that ruling as well. Judge Gleeson found that there was a break because Fiorentino went to the Dominican Republic. There's no such break. Just to sort of simplify this, is it the case that the statute of limitations defense was rejected on the Rule 33 motion on the ground that it had been waived for failure to raise it earlier? But I think that the judge still considered it and she went through. Yes, but. Yes, but. And then she considered that there was no statute of limitations problem anyway because into 2006, as she specifically noted in her opinion, in 2006, both Rodriguez and Fiorentino were stopped four times with police paraphernalia in their car or they were searched at their residence. So there were several times well into the statute of limitations period that both Rodriguez and Fiorentino were found with the evidence of a continuing conspiracy, which addresses the issue of both Payne and Pratty, that there was an underlying continuing conspiracy going all the way. They remained in possession of things that were used in the robberies. Robberies, exactly. It doesn't necessarily mean that the robberies are continuing, does it? Well, but then we see in 2008 there was a big sting operation in which several, most of the defendants were apprehended at that time. In 2008, exactly planning to steal 100 kilograms of cocaine from a source that was coming from Mexico. Are we talking about Marcos Rodriguez in that instance? Marcos Rodriguez was not part of that sting, but he never withdrawn from the conspiracy and there were other co-conspirators that he was working with that were continuing to do the conspiracy. And unless he and he didn't withdraw from the conspiracy, just because different factions are continuing on and doing the conspiracy, it doesn't matter that Marcos Rodriguez wasn't part of that sting operation. The conspiracies continued well into the limitations period. And as for the point about United States v. Pratty, I know Judge Kearse is very familiar with both United States v. Payne and Pratty. This continuing conspiracy, the underlying continuing conspiracy of the narcotics and the Hobbs Act robberies shows that it doesn't matter whether or not an actual gun was found on Rodriguez or with Rodriguez afterward. And if Your Honors have no further questions, then we'll sit down. Thank you, Your Honors. Thank you. Just two brief points. One, I don't dispute that there's a different standard at sentencing on what factual findings get made. It would be a preponderance of the evidence at sentencing. But that's made by the judge, not by the probation department. So the fact that there's an allegation in the pre-sentence investigation report that Randall Martinez brandished a firearm that is not objected to and then affirmed by his counsel at sentencing takes that out of the role of the judge being able to make a determination about it. And a full vetting of that had the attorney actually objected and put evidence in, contrary to what the government had already put in to probation. The other point is just, Mr. Martinez, of course, at the plea colloquy articulated facts, and I don't dispute that he said things that made the 924C charge go through. The point is that he wasn't advised about the reasonable foreseeability that another person was going to brandish a firearm, and he would be held responsible for it despite the fact that he didn't possess a firearm himself. So the plain error around it is that he's not advised in the full vetting at the plea with respect to the charges, not that he actually said something that satisfied it. Thank you. Thank you. May it please the Court, Your Honor, with regard to the obstruction point, I very briefly want to address the government's contention that this maybe could have been an ongoing grand jury. There was no evidence of that before the trial jury, so for the government to say that now is simply irrelevant because if it wasn't before the trial jury, it shouldn't be considered. The idea that maybe people could have flipped and been apprehended later, it's speculation on top of conjecture. In Arthur Anderson, there's a quote about how courts are supposed to place meats and bounds on the very broad language of catch-all provisions. They are talking about 1503, later imported to 1512. This is not saying that maybe theoretically someone later could have flipped. That's not reading a catch-all provision tightly, as the Court says we're supposed to. With regard to the ID point, it wasn't that Rosa Giordano could no longer make the ID. It's worse than that. She was never able to make the ID in the first place. She said she told the jury that she wasn't really paying attention, honestly was just thinking about how to get out of there. She wasn't even with Tejada in the first instance. She ran screaming out of the house, and most of the night was a blur. Her husband did most of the talking. If the Court's going to expand 801 to allow officers to start testifying about this, at least do it on a case where there was a reliable ID, but don't do it here. With the argument that the Schley Avenue robbery was sufficiently corroborated, the government did argue vehemently a trial that Sergeant Jones and PD documents said Tejada was guilty. We argued equally as vehemently that it exonerated him, and it was probably the most hotly contested portion of the entire case, and frankly the reason that there was a mistrial, a hung jury in the first trial, if I may be so bold as to offer that opinion. I absolutely stick to this notion that it was damning testimony. If there's a quote from Perry, the 2012 Supreme Court case, it talks about how dangerous ID evidence is, especially with juries. If you're going to allow it, the checks on that are strict enforcement of the rules of evidence and cross-examination, so if you're going to allow it in here, you've lost both of those checks on it, and it's too damning to the defendant. Thank you. Thank you. Please, the Court. In connection to Ms. Schwader's observation that I made an argument to Judge Towns about inconsistent verdicts, there were actually two Rule 33 challenges. The first one was to the overall conviction on the Hobbs Act and narcotics conspiracies because the argument was that these are multiple conspiracies and they are barred by the statute of limitations. I lost that one, and I'm not raising that. I'm not trying to revive that on this appeal. The additional Rule 33 petition that I put in is based exclusively on the 924C conviction and the seven-year consecutive sentence. In that particular case, I argued to the judge based on a combination of Rosemont and Pratti and Judge Gleeson's ruling on substantially the same record that the 924C should have been dismissed and he shouldn't be sentenced any consecutive time. Judge Towns at that point said, well, I don't know if the records are substantially the same. I'm only ruling based on the record before me. Whereas in the earlier Rule 33 proceedings when I said, well, there are such things as inconsistent verdicts, she says, well, you know, Fiorentino raised the same issue to the jury and the jury ruled against him. So at that time, the judge was saying, well, the records were substantially the same so you don't have much of an argument on multiple conspiracies. And later on at the sentencing, the reverse is true. The bottom line is that if indeed firearms is a continuing offense to be tagged to the predicate offenses and not a point-in-time offense, if you look at that strictly, then Pratti should have been decided the other way altogether. In other words, when the gun, and I know Judge Kearse is the one who actually authored both the Pratti and the Payne decisions, in Pratti the gun was seized, the gun on which 924C was predicated, was seized outside the statute of limitations. Here we don't have any seizures of guns, but we also have absolutely no evidence of any gun use, possession, or brandishment at all at any time past the summer of 2004, and my client is arrested over five years later. So if we're going to start engaging in fictions, then Pratti should have been decided the other way as well. So I adhere to Judge Gleason's rationale in ruling on substantially the same record, and I believe that that shows that there was plain error here. Thank you. That's all I have. Thank you. Thank you all. We will reserve decision.